On the trial the cashier of the bank proved that the bond was offered by Henry Hunter and discounted for his benefit fourteen days after its date; that it was the universal practice of the bank, on discounting bonds, to take interest in advance on the whole amount; that when a bond was made payable at 88 days after its date and was discounted on the day of (101) its date, interest for 92 days was deducted, and that the interest was calculated at the rate of 1 per cent for sixty days, according to Rowlett's tables, which were formed upon the supposition that the year consisted of only 360 days; that interest was calculated on the bond in question, according to the above principles, for 78 days. He stated that before the discount of this bond he was aware that the principles upon which the tables were formed gave a greater rate of interest than 6 per centum per annum, but as the book had been long used in the bank, before his appointment, he adhered to its use, believing the mode of calculation to be lawful; that the tables were used for the sake of accuracy and dispatch, and from no other motive.
This witness also proved that the bond had been offered by Hunter in renewal of one for the same amount, dated 22 June, 1819, and payable 88 days thereafter; the last in renewal of a *Page 74 
former one, dated 16 February, 1819, also payable at 88 days, and so on in a course of renewals; that all these were discounted on the days of their dates, in the manner and upon the principles above mentioned; that frequently Hunter on renewing did not pay in cash the difference between the net proceeds of the new bond and the amount of the old one, and as the bank never received partial payments, the settlement was sometimes postponed for days, weeks, and even months, and when made, interest was taken on the old bond from its maturity, without regarding the discount of the new one.
The witness also proved that in discounting bonds the directors of the bank discriminated between those offered for renewal and new ones, but whenever a discount was made, the proceeds of the bond were credited to the person for whose benefit (102) it was offered, and were not applied to the old note, or to any other purpose, without his check; that Hunter often complained of the mode adopted in settling the old bonds as injurious and oppressive; that these complaints were represented to the directors, who ordered the witness to persist in it. He stated that the bank allowed three days of grace on every bond; that the reason of taking discount for ninety-two days was to make the renewals take place on the same day of the week; that the board met every Monday night, the bonds offered were usually dated as of the next day, and the proceeds of those discounted were passed to the credit of the offerer, on the morning of Tuesday, and were subject to his order on that day; and that although the proceeds of bonds offered for renewal passed to the credit of the offerer, yet they could only be applied to the payment of the old bond.
A witness was examined, who had formerly been cashier, who agreed with the other witness as to the custom of the bank in discounting, and the manner of calculating; but he stated the reason why 92 days interest was taken was this, that the time the bond had to run was estimated as 88 days, exclusive of the day of its date, and as the borrower had the use of the money on that day, the time of the loan was 89 days, besides the days of grace.
His Honor, Judge Paxton, instructed the jury that deducting the interest at the time of making the discount, supposing the interest was calculated on proper principles, was not usurious; that it was usurious to calculate the interest according to Rowlett's tables, the officers being aware of the principle of calculation adopted in those tables, and that their supposition that this mode was lawful made no difference; that a corrupt agreement *Page 75 
means any agreement which violates the statute, and that although a mistake in fact, as a miscalculation upon a right principle, is not usurious, yet a calculation upon a wrong principle, however innocently made, is usurious; and that in this case, if it was the intent to take interest at a (103) rate greater than that allowed by law, through ignorance, it was a corrupt intent within the statute; that receiving interest on the old note up to the time of settlement, if the new note carried interest only from that time, was not usurious; but if interest was calculated on the old note to the time of settlement from its maturity, and interest was also reserved out of the new note for the same time, it was usurious.
That as to the days of grace, if the defendants had the use of money for 92 days, and legal interest only was calculated for that time, it was not usurious.
The jury returned a verdict for the plaintiff, and assessed the damages to $1,615.72. A rule for a new trial was obtained by the defendants upon the grounds that the verdict was contrary to law and to evidence, and that the jury had been misdirected by the judge. His Honor informed the counsel for the plaintiff that the verdict would be set aside and a new trial granted, unless the excess of interest was remitted. The plaintiff then remitted $350, "the excess aforesaid," whereupon the rule was discharged, and judgment rendered for the plaintiffs, from which the defendants appealed.
We are satisfied with the decision of the Court in Bank v. Pugh, 8 N.C. 198; we therefore decline entering into an examination of the question whether the court mistook its duty in refusing a new trial. It is a mistake to suppose that this Court, since the repeal of the act declaring that it possessed appellate powers upon questions of fact, ever has awarded a new trial because the judge below refused one. The new trials which have been awarded here were in cases where there was some error which infected the verdict; such as the admission or rejection of evidence, which ought to have been received or rejected, or some misdirection of the judge to the jury on questions of law arising on the trial, or the like. Since the statute of Westminster II., 31 Ed. I., such matters may be assigned for error, and provision is made by the statute for getting them on the record, when brought into the court of *Page 76 
(122) errors. Our statements accompanying the records sent here are nothing but a practical construction put upon that statute, and owe their origin to our act of 1799, relative to the mode of bringing points of law arising on the circuit before the meeting of the judges, directed by that act. This mode was still practiced in cases of appeal afterwards allowed, and was continued after the organization of the present court. These statements we consider as containing the proceedings excepted to in the court below by the party against whom they operated. The judgment on the verdict obtained improperly, that is, through the error of the judge, is here reversed, and the cause remanded, with directions to issue a venire facias de novo. The new trial is, therefore, in consequence of the relief authorized by the statute. We may have inadvertently interfered in cases where we ought not; I think, in all probability, we did inCherry v. Slade, 7 N.C. 82. We have not the power of examining those parts of the charge operating in favor of the defendants, for they are not excepted to.
But it is said that we ought to grant a new trial because the plaintiff, by remitting what is called "the excess of interest," has admitted that the contract was usurious. This affords ground for a judgment for the defendant if it affords foundation for any act of this Court, for it is an admission of record that the contract was usurious. Why, then, send it to a jury to try that fact? But there is no admission of such fact. It is quite probable that it was admitted as usurious interest under the charge of the judge; but the court acts upon facts, not upon probabilities, and this admission is nothing but evidence of a fact; it is possible the plaintiff may have remitted from other causes. He might for some reasons unknown to us wish to retain his verdict. He may have feared that he would not be able to obtain so large a one at another time; he may have feared that delay would produce the loss of the debt through insolvency; or he may have had an immediate demand (123) for the money. These, it is true, are very improbable conjectures, but they may be correct; and if they may be so, it proves that it is not an inference of law, but of fact. In addition to this, it would not be sufficient for the plaintiff to acknowledge simply that he was guilty of usury in the contract, but he must confess how, that the court may see that the statute has been violated; for peradventure he might mistake what usury is within that statute. This is, therefore, neither cause for a new trial nor for a judgment for the defendant. But if the plaintiffs distinctly admit upon the record any fact which *Page 77 
shows they are not entitled to recover, the court would be as much bound to notice it as if found by the jury, for the admissions of the parties upon the record are the highest evidence of the facts.
If there is any error examinable by this Court, it arises from those parts of the charge which were in favor of the plaintiffs, for these are understood as excepted to by the defendant. These are, that taking interest in advance on this bond was not usurious; and that taking interest for 92 days on this bond, it being given for renewal, is not usurious, for so I must understand this charge, notwithstanding the qualification that if the defendants had the use of the plaintiff's money, they ought to pay interest on it.
That the statute of usury is violated by taking the interest in advance, on the whole sum lent, is almost too evident to require argument. If the sum, say $100, agreed to be loaned for one year, at 6 per cent per annum, is counted down, and the lender immediately withdraws $6, by way of discount or interest, the sum actually forborne, which is the matrix of interest, is only $94, which at that rate of interest, together with itself, produces at the end of the year $99.66 — less, by 34 cents, than the sum to be paid at the end of the year. As, therefore, taking the interest in advance gives an interest of $6 for one year, or $94, the statute is violated, for it plainly directs that six (124) pounds only (i. e., $6) shall be taken on the hundred for forbearance for one year, and in the same proportion for a greater or less sum, and for a longer or shorter time. The rule extended completely shows its impropriety by producing a result perfectly absurd. A note for $100, payable 16 years and 8 months after date, is offered for discount on the day of its date; if the interest on the whole sum is taken in advance it absorbs the whole amount of the note; the person who discounts it pays not a cent for it; of course, the person who offers it gets nothing. The rule of a discount — and such, no doubt, the Legislature intended to be permitted by the statute of usury (whatever they may have meant when they incorporated the State Bank) — was that such a sum should be advanced upon a discount as would, together with its interest, amount to the sum to be paid at the maturity of the note. I speak not of the purchase of a note or bill in market, for that may be made at any price, taking care that it is not a device to cloak a loan; if it is a fair purchase the statute has nothing to do with it. We can derive nothing from what was said by the Supreme Court of the United States, that an authority to make discounts gives *Page 78 
an authority to take interest in advance. True; but is the discount to be equal to the interest on the whole sum lent or only equal to the interest on the balance, after taking out the discount, the words in the statute being that more than six pounds on the hundred shall not be taken by way of "discount or interest." And I take it to be very clear — indeed, so much so that not a shadow of doubt is left on my mind — that the authority to make discounts gives the power to make them in such a way only as to leave as much outstanding as will, with its interest, amount to the sum to be paid at the maturity of the bill, note or bond; for a bond, being assignable by our law, it is as much the (125) subject of discount as a note. Were this case, therefore, to be decided by the application of our statute against usury to its facts, unaffected by other considerations, I could not hesitate to declare the bond usurious, and therefore void.
But an exposition, legislative, judicial, and popular, has been given to this statute and to usury laws similar to it, which I am bound to respect. When the charter of this bank was granted there had been in operation for some years two banks chartered by the State, whose operations were extensive, and whose practice of taking interest in advance on the whole sum loaned must have been known to the Legislature. The old bank of the United States had been in operation for twenty years, which discounted in the same manner. Banks in adjoining States and others with which we had great intercourse were also in operation, governing themselves by the same rules. With this information before them this charter was worded, in substance, in the same manner as to the point we are now considering and I believe in the same words as that of the bank of the United States. The State was a stockholder in each of our local banks and many shares were retained for the State in this bank. These are strong legislative expositions.
In the courts in New York, Pennsylvania, Massachusetts, and Connecticut, this practice has been declared not within their statutes of usury, which are similar to our own, and it has been sanctioned by the supreme judicial tribunal of the Union, and in England, even in the case of private bankers; but I shall be told it has been sanctioned only in case of negotiable bills and notes, and not in the case of bonds. The principle has been applied there to negotiable securities, and bonds there, not being negotiable, could not be discounted; they there applied the remedy as far as the evil extended. The same principle will extend here to bonds. The popular exposition is (126) equally universal, for during the thirty years that our *Page 79 
banks have been in operation, although many millions have been lent on the same terms, this is the first instance of resistance which I have heard of made on these grounds to a recovery. And were I at liberty to hazard a conjecture as to the cause of this contest, I would say that it arose from the oppressive practice of this branch of the bank, in claiming interest on two bonds, running at the same time, that is, charging interest on the old bond and on the newly discounted bond, until the proceeds of the latter were applied to the discharge of the former. But I am free to declare that in a case where the change of construction would produce those evils only which ordinarily arise from the change of decision, I should feel that all which has been done is sufficient to control the plain words of the statute. But when I look to the incalculable injury which must arise from giving a different exposition — injury, the extent of which no man can foresee, the whole of our circulating medium in the hands of individuals, and in our treasury, annihilated and rendered worthless at a single blow — I must confess I am appalled at the consequences, and must abstain from acting, convinced that the obligation which I am under to the State, of asserting the supremacy of the law, does not require it at the expense of the peace and prosperity of individuals and the best interests of the State.
I am inclined to think that taking interest for 92 days on the note for 88 days is not usurious. It is clearly not so for charging interest for the days of grace, although they are not demandable on a bond; for if the contract as made with an understanding that they were to be allowed, the making of a writing whereby they were excluded would not be usurious, for it is the usurious contract which vitiates the security. There cannot be any usurious security if the contract is not usurious. If an authority is wanting to prove a position so plain as this, it will be found in Nevison v. Whitley, Cro. Car., 501; (127) Ord. on Usury, 59. Computing interest for the day on which the new note was taken, if interest for the same day had been taken on the old bond, would be usurious, if it was the same or one continued loan. But I think that it is not, and the most satisfactory evidence of this is afforded from the fact that it was at the option of the bank to continue it or not. It is true that on notes of accommodation it is understood that it is quite probable that the time will be extended upon a compliance with the rules of the bank; but at the same time it is also well understood that the bank may, at its option, enforce payment, which must exclude all idea that the borrower, by the terms of *Page 80 
the contract, has a further time for payment. I think that it was usury of the most oppressive kind to take interest on the new note before its proceeds were applied to the discharge of the old note, for until that time the bank advanced nothing, and it is no excuse to say that it was Hunter's fault, for he should have paid the difference and drawn a check in favor of his old note. These were the terms imposed by the bank on the new loan, and until they were complied with nothing was advanced; it was a bare agreement to lend upon the performance of the terms by Hunter. It is a fallacy to say that the money was to Hunter's credit and subject to his check; it would only stand to his credit upon his paying the difference, when he could check for it, and then he could only check in favor of the old note. Nothing, therefore, was lent by the bank until the proceeds were applied, and until that time no interest should have been charged. But this Court cannot get at that question; if it could, the judgment would be reversed; for I believe that this mode of doing business is confined to the Tarboro branch of this bank. It has not either a legislative, judicial, or popular sanction.
The universality and notoriety of the practice of taking (128) interest in advance by the banks and their connection with the Government would seem almost to exclude the idea of criminality. Usury, by our laws, is deemed to be a crime, for which forfeitures are inflicted on the offender, as loss of the debt, and double the amount loaned or forborne, together with a liability to an indictment. In offenses of this kind if the actor is guilty, every person who is concerned in the transaction is guilty also: the directory, as having ordered the usury, which may well be inferred from their subsequent sanction, and even the stockholders if they knew it, by receiving the dividends, incurred the forfeiture. In this latter case the State would be implicated, it being a stockholder to a large amount. This must exclude all idea of actual criminality. I say actual criminality, for in reality there cannot be a crime without an actual intent to violate the law. Crime presupposes a knowledge of the law; and ignorance of law is no defense, not because a knowledge of the law is not essential to crime, but because ignorance is not permitted to be averred and proven, it being a presumption of law that every man (however false in point of fact) knows the public laws. These presumptions of law are nothing else but certain conclusions of fact which the law draws from motives of policy and convenience; as where the probability of a fact is very strong, that there is scarcely a possibility *Page 81 
of its being otherwise, policy, and perhaps justice also, require that it should not be controverted, for, in the first place, it is so often the fact that it had better in all cases be so considered rather than undergo an investigation in each case; and, secondly, even if an investigation in each case was permitted, so imperfect are all human means of arriving at truth that there is more reliance to be placed on the general conclusions than on the result of a particular investigation. Thus, if a stroke is given with a bar of iron it is a presumption of law that he who gave it intended to kill; and, therefore, when death (129) ensues, the actual intent is not the subject of inquiry, although a murder cannot be committed without an actual intent to kill. Here the law presumes the actual intent. So in England, leaving the goods in the possession of the vendor isper se a fraud, that is, a presumption of law that the transaction is fraudulent. It is not so in this State. It is said that the common custom and usage of that country require that this presumption should be made; here we think they do not. There has been an extraordinary change in the presumption of law in the case of murder. Originally murder could only be committed in secret, for it being of its essence that it should be committed with deliberation, that is, with malice aforethought, he who killed another openly and publicly was not believed to have done it with malice aforethought. The punishment being death, it was inferred that he was moved to the act by passion, not by judgment or reason. The presumption of law, therefore, was that he did not commit the act with malice aforethought. But experience proving that this presumption was in fact unfounded, and that wicked men would even in public commit homicide with malice prepense, the rule of presumption was therefore abolished.
I am also induced to believe that, upon the principle that a mistake in point of fact exempts a person from the penalties of usury, the plaintiffs are exempted in this case, for I think it cannot well be believed that they knew that they were violating the law; and ignorance of law, could it be believed, forms as good an excuse as ignorance of fact. They are based on the same principles, the only difference being that in ordinary cases the one is not to be believed, but the other is. Upon the whole, I am of opinion that the judgment should be affirmed.
(130)